May it please the court. My name is Bob Lean. I represent Harminder Singh, who is appealing his criminal conviction. My arguments today deal with count 10, a bringing count. It's the defense position that if Mr. Singh was sentenced on May 4th, 2007, if he was sentenced one week later, our position is that there would have been an entirely different sentencing hearing. On May 7th, this Court decided its in-bank decision in Lopez. And Lopez had resolved an ongoing disagreement among the different panels of this Court as to when a bringing offense ends. The Court found that a bringing offense ends when a person is brought to his immediate destination inside the United States. However, under a theory that was rejected by Lopez, and that was the theory under Ramirez-Martinez, where all it took was concerted action, that's how someone like Mr. Singh, who is a cab driver, picked up a smuggled alien at a travel, a low-end travel lodge by Sea-Tac International Airport and took her to her final destination, to Newark. Flew with her to Newark and dropped her off in New Jersey. Let me pursue that comment that you just made, that he was just a taxi cab driver who picked her up when she arrived at the motel at the Sea-Tac Airport. The record reflects that earlier that day, he had had conversations, and he had some earlier conversations as well with folks in Canada. Yes. But earlier that day, before she walked across the border, the plane, there had been some phone calls. Yes. What do we do with that? Well, here's what I think you do with that, Your Honor. I have to step back a little. Originally, he was charged with conspiracy to bring and to transport. The jury only decided whether he conspired to transport. The bringing conviction has to rest on aiding and abetting theory. Yes. Our position is that a person who stands, even a person who stands ready, willing, and able to transport, and the bringers know this, that doesn't make him a bringer also. And we think that Lopez can be ready to say that. Couldn't one make a reasonable argument that the fact that, you know, that day they had arranged for your client to, that he had agreed that he would meet her at the Sea-Tac motel or hotel? Yes, sir. And take her, accompany her to New York with the passport, bring the passport back, that that quote-unquote provided encouragement to the folks in Canada to go ahead with helping her bring her to the United States? Your Honor, I understand exactly the position you're taking, but I think it gets at the I'm just trying to answer. These are questions that are lurking. If you read Lopez carefully, these are questions that one might want to ask. Well, I think, respectfully, Lopez, I think, rejected that argument, the encouragement, the concert action. It required, actually, that you do something, not just let the people know that you're there for them, if they can get to you. And that's really what the calls they said, this adds nothing to the equation here. I thought those calls took place after the alien was dropped off. They did. Well, as these calls took place before the alien here, Ms. Patel, made it to the United States. Is that accurate? In Lopez, the calls were, I think the two calls were afterwards. I'm only thinking about this case. In this call, he called both before, during, and after. But the call after, what's the... But isn't it, I mean, it seems from Lopez that the language is pretty clear. You can have aiding and abetting liability if he had the specific intent to facilitate the commission of a crime, such as the bringing a cross, and you assisted or participated in that. So that's why the Lopez court says, well, you can't really bring someone to, based on what you did after the fact. So if you really look at his conduct before, which was setting it up, making sure you've got a guy that's going to be brought across the border, why isn't that the question left unanswered in Lopez, which was, what do you need to establish aiding and abetting liability? Yes, Your Honor. Our position is that that very argument was rejected in Lopez, and it was rejected because the test isn't going to be how prepared the transporter is. If they've done it a few times, then they can be relied upon and they become part of the bringing offense. But if they only do it once or twice and only have a little advanced knowledge, then they're just transporting. And I think that that's the... Where does it say that in Lopez? Where does Lopez say that? Because I missed that part. Because Lopez rejects squarely, twice, the decision in Ramirez-Martinez. And that's exactly what Ramirez-Martinez was saying. You could be part of the offense by acting in concert with the offense. And it didn't really matter when you acted, as long as you acted in concert. And it uses those words. That was rejected. That whole theory of liability on aiding and abetting in Lopez. And we submit that just the telephone call falls into that rejected argument. That's our position, Your Honor. Well, let me... Could I just read from Lopez, and then maybe we can slice a little thinner? Lopez says, the mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting. And brings to. And then it cites the cases you just referred to, Ramirez-Martinez and Angwin. Yes, Your Honor. But the question I think we're asking is, this is not just picking someone up on this side of the border. There's a plus factor here. And that is the arrangements made and other things in terms of the bringing. So I'm not sure that Ramirez-Martinez really is this situation. That's what troubles me. Your Honor, respectfully, it says in Part C of the decision, the government's second theory of aiding and abetting liability. And then it discusses it. And it says, and under head note on page 1200, the fact that following the completion of the brings to offense, Lopez twice spoke to a person who may have been the transporter doesn't add anything to the equation. But our position is that it's really saying But that's after the fact. It is after the fact, Your Honor. But the fact that the people brought didn't depend on whether or not Mr. Singh actually could transport the person. They just needed to get in touch with a transporter. So he says, I'm here if the person's actually brought. He has no control of the person's actually brought or if they're actually brought. He's just saying, if you can get them to here, then I'll take them the next step. And our position is that really when it addressed the aiding and abetting prong, it said the Ramirez-Martinez theory like that has to be looked at. You have to look more in terms of where does the person come in contact with the smuggled person and what does he do with him, and not whether someone else brought him to him because he said he'd be there. Counsel, can you refresh me as to the content of each of the phone calls and particularly the call that was made after she had crossed? Your Honor, after she had crossed, he was at the airport and they were actually getting on a plane. And he was talking to the person who was responsible for the bringing and said, they're talking to us now. And I think we're sunk. And then he said, well, they've let us pass through, so now we're continuing our travel. That's after. What about before? Before, he'd said that he, they said that the person would be coming. They thought it would be later that day. Here's where she would be at. She was wearing a purple dress or a certain color clothing. And then he came around in his cab and stepped into the motel, the SeaTac Inn lobby, and there she was. And he picked her up and he then transported her to the airport, then took her on the rest of her voyage trip. I'd like, I have 35 seconds on reserve.  Please, the court. Good morning, Your Honors. My name is Lisa Borchesky and I represent the United States. I think this court has really touched on the crux of this issue, which is when did this offense, when was it completed? And what did this particular defendant do before the offense was completed to show he had the specific intent to bring about the crime of bringing an alien into the United States? And based on that question, this case is substantially different from the facts that this court saw in United States v. Lopez. Because in that case, there was nothing in the record to reflect that the individual who transported those aliens had any contact with the principles of that operation until well after, in fact, one day after those aliens had been in the United States. Would she have been crossed unless they had an agreement from him to pick her up? No, Your Honor. It's the government's position that this particular alien, and we know based on intercepted calls, it was a $2,000 contract for her to not only get across the border, but someone accompany her on a plane from one coast of the United States to the other coast of the United States. I guess that doesn't quite answer my question. I'm sorry, Your Honor. My question is, would she have been crossed even if the same had been this agreement? The government's position is no, Your Honor. Now, what is your evidence of that? The evidence of that, Your Honor, is certainly the evidences in this case to be construed in the light most favorable to the government. The facts are what existed for this particular alien before she crossed. And we know precisely what those facts were based on the intercepted conversation, that this person didn't speak English, that she not only needed a plane ticket purchased for her, but she needed to be accompanied physically because she couldn't speak English to get to her destination on the East Coast. And also, the principals needed the individual who transported her to collect her fee, to collect a $2,000 payment, to collect her passport, and to bring those items back to the principals in Canada. And until those circumstances were arranged, it's reasonable to infer that they would not have sent this woman into the United States who didn't speak English without knowing who was going to be picking her up on the other side and completing her journey to the East Coast. And for that reason, but... They were to receive, they were to have received $65,000 from, I guess, Ms. Patel and her husband, is that correct? That's correct, Your Honor. That's quite an incentive to get her across the border, correct? Absolutely. A huge incentive. So I guess they would have gotten her across with somebody to pick her up. That's correct, Your Honor. And this is the unique circumstance where we know precisely, based on the intercepted calls, when this defendant actually called and solicited for work. He wasn't called to say, hey, can you come get someone? He called the principals in Canada and said, do you have any smuggling work for me? They said, we have someone, but it hasn't started yet. We don't even have the beginnings of that crime. And it was only five hours later, we have an actual RCMP constable sitting at the border, watching Alpa Patel come across into the United States at 6.30 that evening. Now, we know that she was met initially by somebody else as she came across the border. Yes, Your Honor. Matthew DeHage, a co-conspirator who testified at trial. So doesn't that show that they would have brought her across any... I mean, he was there to greet her, bring her into Seattle, and set her up in a motel. A motel. There is no evidence in the record when Matthew DeHage specifically was contacted and his leg of the operation came to fruition. What we do know, based on the principal, Keval Multani, he said, told Harminder Singh in an intercepted call, we haven't started this yet because it hasn't been arranged. And in that sense, Your Honor, this defendant is participating in the planning operation before this individual ever enters the United States. And that dates back even four months prior to this actual smuggling incident, when he traveled on three occasions to Canada, met with those co-conspirators. And it isn't a situation where we just knew there were phone calls or we knew there were meetings. We know the content. We know the content of the phone calls because they were recorded. We know the content of those meetings because the co-conspirators who participated discussed these meetings were about smuggling activity. And we talked about specifically... Let me ask you if the facts were a little bit different. We know from Lopez that certain of these after-the-fact phone calls and conduct really isn't enough to put you and Ader in a better liability. And sometimes we know that the transporters are contacted within the United States and arrangements are made within the United States after the fact. If there had simply been a phone call to him that said, pick up this lady and take her to New York or just pick her up, and that phone call occurred before he picked her up, in your view, is that enough for Ader in a better liability? Your Honor, based on those narrow facts, without more, I don't think that would be enough based on the reading of United States v. Lopez. And that really is with absolutely nothing more. You could have that one phone call and then have evidence of the content because the call was intercepted or prior meetings, as in this case, with the principals that the individual had that phone call with, and specifically when those acts occurred. So my question, I guess my question goes then to whether it's a question of degree and content that puts you into Ader in a better liability. In other words, if there's more phone calls or more content, are you saying that simply agreeing to the arrangement would not land you in Ader in a better land? Well, as this Court tells us in United States v. Lopez, there must be enough evidence that there is a specific intent to bring about the offense. If someone got a phone call and said, hey, pick someone up, without more, maybe we don't have enough to say. At that point in time, the person knew the person that they were picking up was illegal, that they were aiding and abetting this overall crime. And that's just not the facts that we have in this case, with this defendant's month-long participation in alien smuggling before Alpa Patel ever crossed into the United States. We know here that she would have been crossed in any event. They would have found someone to do it. And he's only providing the transportation within the United States. You can convict him, and you did convict him of all of the offenses for conduct within the United States. Should we be extending, actually an extension of aiding and abetting to say, because he's the one who decided to transport her within the United States, that that's enough? Your Honor, the government doesn't believe this to be an extension, because the defendant is actually being charged and convicted with all those acts that led up to the smuggling of Alpa Patel. And he wasn't some innocent bystander sitting waiting for a phone call in the United States. The crime of aiding and abetting is reflective of the defendant's conduct, reflective of three meetings in Canada he had with the co-conspirators, recruiting another driver for the organization, for saying, hey, I'm here. Do you have any work for me? And I'm the person that's going to get anyone you need to the other continent or to the other coast, rather. But it's conditioned on their getting into the United States. He wasn't going to cross them. Right. I completely agree. It was conditioned on the principal sending her. And the government's position is they would not have sent her, but for this defendant being ready on this end of the border to get her that evening to her final destination. Under Lopez, when did the offense of bringing two come to an end? This offense ended on January 26th at 6.29 p.m. and the moment when Alpa Patel set foot in the United States. I don't think there's any dispute from the government or defense on that issue. And for that reason, everything that this defendant did in the months leading up to that demonstrate his specific intent and absolutely demonstrate his encouragement, his facilitation of the principals to send Ms. Alpa Patel into the United States. Could I ask you the same question that I asked opposing counsel? What was the content of the conversations that took place before she crossed and the one that took place shortly after she crossed? The content of the conversations before Ms. Alpa Patel crossed in was the defendant calling the principals in Canada asking for smuggling work, saying that he was starving, he didn't have money, he was owed $3,500 for prior smuggling work, and asking if, in fact, there was anything he could help them with. Could I clarify that one, what you just said right there? Was that on the day of the incident or was that several weeks before? That occurred actually on the day of the incident and within three days of the incident. We have both of those phone calls in the record and have been submitted in. What other phone calls occurred on the day of the incident? So he calls up and he says, do you have any work for me? What else did he do? What other calls did he make? That actually is the only call that the government has submitted with respect to the day of the incident that occurred before the offense was completed. Certainly after the offense was completed, there was a multitude of calls. Let me get this scenario correct. So on the day of the incident when she crosses, earlier that day, he calls, I forget who it is in Canada, and says, do you have any work for me? Yes, Your Honor. Okay. What do they say in response to that? And I see my time is up. In response to that, they said, actually, we do. Cable Multani said, we do have work and it hasn't started yet. Here's this $2,000 contract I have. These are the events that need to take place. The defendant's response is, send her. Do it. Send her. I will drop her off. I will take her to her final journey. I will get the book. They said, all right. All right. So then, how much later in that day, when's the next call? And who makes it? The next call that we have in the record is after Ms. Alpa Patel has crossed into the United States, which occurred, again, at 6.30 that evening, and there is communication between Cable Multani and Arminder Singh saying, this is where she'll be, and there's multiple calls going back and forth of the defendant concurring that he's moving to that location, he'll be there in five minutes, he sees her in the lobby, he's picked her up, where he's going with her, and then, ultimately, the contact at the airport when the defendant says, yes, we're done for, they've got us. So all of those conversations then occur after the fact. Let me see if Judge McEwen has any further questions. I have nothing further. Thank you. Thank you.  Your Honors, I just wanted to address one or two points quickly. My client wasn't convicted on a conspiracy or a Pinkerton theory. He wasn't charged with a conspiracy to bring. Also, in Lopez, the lady who picked up, Ms. Lopez, who picked up the people, was told to look for a sweater in the road, and that would mark the spot, suggesting there was prior knowledge of where to go. Our position is that Lopez stands for the proposition and rejected the other line of thinking, that a person who is ready, willing, and able, because you can rely on them or not rely on them, that's the test of whether or not they aided and abetted. So our position is that he did not aid and abet. Lopez governs his decision.  reversed, then that decision, count 10, has to be reversed and the matter should be remanded for resentencing. Thank you very much. Thank you. We appreciate counsel's arguments. And the matter will be submitted.
judges: Fletcher, McKeown, Paez